IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| AMERICAN BIRD CONSERVANCY | ) | |
|     PLAINTIFF | ) | |
| | ) | |
|     v. | ) | CIVIL ACTION NO. 1:13-CV-723 TSE/TRJ |
| | ) | |
| U.S. FISH AND WILDLIFE SERVICE | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| | ) | |
|     DEFENDANTS | ) | |

**PLAINTIFF AMERICAN BIRD CONSERVANCY'S REPLY IN SUPPORT
OF ITS APPLICATION FOR ATTORNEYS' FEES AND COSTS**

Plaintiff American Bird Conservancy's ("ABC")'s application for an award of attorneys' fees and costs explained that ABC is eligible for a fee award under the Freedom of Information Act ("FOIA") – both because this lawsuit triggered the release of records relating to the federal government's oversight and regulation of wind power impacts on eagles and other migratory birds and because the Court issued orders resulting in the release of additional records – and entitled to such an award in view of ABC's status as a non-profit organization and the undeniable public interest in the subject matter of the request. ABC further demonstrated, supported by declarations, that the lodestar they are seeking for the work they spent on the case is reasonable.

In response, Defendants have conceded that ABC *is* eligible for a fee award in light of the fact that, as a result of several Court orders, ABC has received a number of documents that Defendants initially sought to withhold. *See* Defendants' Response to Plaintiff's Application for Attorney Fees and Costs ("Def. Resp.") at 4 ("We therefore do not challenge [ABC's] eligibility for an award of fees and costs."). Defendants, however, contend that ABC is not entitled to any

award and that ABC has not adequately supported the specific request that it has advanced. Neither argument is legally or factually supportable.

## I. ABC IS ENTITLED TO A FEE AWARD

In challenging ABC's entitlement to a fee award, Defendants do not dispute that ABC is a non-profit conservation organization; that ABC has no commercial interest in this FOIA litigation; and that the general subject matter of the litigation – the federal government's oversight and regulation of the burgeoning wind power industry's impacts on bald and golden eagles and other federally protected wildlife – involves the kind of matter of public concern and controversy that the FOIA was designed to open up to scrutiny.  See Plaintiff's Application for Attorneys' Fees ("Pl. App.") at 8-11.  Instead, Defendants' entitlement argument is based on the proposition that this litigation was not the actual cause of *all* of the document releases that occurred following the filing of the litigation, and hence ABC should not receive an award based on *those* releases.  See Def. Resp. at 4-7.  As discussed below, this argument is both legally irrelevant – because ABC is entitled to a fee award regardless of the validity of Defendants' causation argument – and, in any case, erroneous.

### A. The Document Releases That Defendants Concede Support Entitlement Are Sufficient To Also Support Eligibility.

To begin with, Defendants' argument improperly conflates the entitlement and eligibility issues.  As the case law on which Defendants rely demonstrates, courts analyze the causal relationship between FOIA litigation and subsequent document disclosures to assess the plaintiff's threshold *eligibility* for a fee award.  See, e.g., Weisberg v. Dep't of Justice, 745 F.2d 1476, 1496 (D.C. Cir. 1984) (addressing whether the lawsuit was the cause of the release of records in assessing the plaintiff's eligibility for a fee award); Calypso Cargo Ltd. v. U.S. Coast

*Guard*, 850 F. Supp. 2d 181, 183 (D.D.C. 2011) (finding that the plaintiff "is not eligible for an award of attorney's fees" because there was no evidence that the lawsuit had triggered the release of *any* documents). Because Defendants have *conceded* eligibility based on court-ordered releases, and since those releases are alone sufficient to support entitlement, the Court need not even address Defendants' causation argument regarding the other disclosures.

In fact, Defendants concede or do not dispute that two of the five distinct document releases that occurred post-litigation resulted directly from judicial decrees. Not only did the Court ultimately grant summary judgment and order the disclosure of eleven documents that did not fit the exemption claims that had been advanced, but Defendants also do not dispute that the document release on May 6, 2014 resulted directly from this Court's decrees. *See* Pl. App. at 5. In fact, it took *three* separate court orders for ABC to obtain those documents because Defendants failed to release them in connection with their first two attempts at complying with the Court's instructions for in camera review. *Id*. Only in the course of complying with the Court's third Order did Defendants determine that these documents – as to which summary judgment briefing had already been completed – "should be released in full." ECF No. 40-1. Accordingly, it is indisputable – and Defendants do not dispute – that this release, as well as the one resulting from the Court's summary judgment disposition – may in fact serve as the basis for a fee award. *See Mullen v. U.S. Army Criminal Investigation Commnd*, No. 1:10cv262 (JCC/TCB), 2012 WL 2681300, at *7 (E.D. Va. 2012) (holding that a court order "directing [the defendant] to file a representative sampling" of documents addressed in a *Vaughn* index, and that resulted in a release of previously withheld documents, was sufficient court ordered relief to qualify the plaintiff as "substantially prevailing" party).

Moreover, the declaration from ABC's Vice President for Conservation Advocacy explains in detail that *those specific document releases* contained information of significant value to ABC and other members of the public in understanding the role and actions of the U.S. Fish and Wildlife Service ("FWS" or "Service") and the Department of the Interior ("DOI") in addressing the impacts of wind turbines on eagles and other wildlife. The May 6, 2014 release contained information bearing on the legality of the process by which Defendants developed a highly controversial regulation authorizing the killing of eagles by wind power projects. *See* Supplemental Declaration of Darin C. Schroeder (ECF No. 46-1) at ¶ 9 (explaining that the May 6, 2014 document release "contained additional documents bearing on the controversial eagle permitting rule and the Service's and Interior Department's meetings with outside groups and individuals during the development of the rule" and that "[o]f particular interest to ABC and other members of the public is information in the released documents indicating that Service officials were aware that the meetings raised questions about potential violations of the Federal Advisory Committee Act, which requires that when federal agencies rely on outside advisory committees they must satisfy certain standards of openness and accountability").

Likewise, ABC has explained how the specific documents disclosed as a result of the Court's grant of partial summary judgment to ABC "also contribute to ABC's and the public's ability to understand how the government is approaching its responsibilities to protect migratory birds while promoting the development of renewable energy." *Id.* at ¶ 11 ("For example, one of the released documents demonstrates that ABC's concerns about 'closed meetings' with outside groups during the development of the 30-year eagle take rule received high level attention from the Deputy Secretary of the Interior Department as well as other high-ranking officials," and also

indicates that another federal agency – the National Park Service – is "'opposed to the [eagle] tenure rule,' which may be considerable public and media interest.").[1]

Defendants advance no persuasive argument as to why these court-ordered releases are not *alone* sufficient to entitle ABC to a reasonable award of fees. As previously explained, *see* Pl. App. at 11, precedent in this jurisdiction establishes that court-ordered releases of documents on matters of public policy "*to public interest organizations*" is exactly what Congress contemplated in crafting FOIA's attorneys' fees provision. *Sabalos v. Reagan*, 520 F. Supp. 2d 1069, 1071 (E.D. Va. 1981) (emphasis added); *see also Jarno v. Dep't of Homeland Security*, 365 F. Supp. 2d 733, 739 (E.D. Va. 2005) (the attorneys' fees provision was designed to benefit a "non-profit public interest group" in contrast to a "large corporate interest").

Further, as the above excerpts from ABC's declarant demonstrate, Defendants are wrong in asserting that the declaration states only "in conclusory fashion that the documents it received furthers its 'programmatic interests.'" Def. Resp. at 7. In fact, the declaration painstakingly details the various ways in which the document releases have in fact contributed to ABC's and the public's understanding of important regulatory and other issues bearing on the development of wind power and its impacts on eagles and other federally protected wildlife. *See* ECF No. 46-1 at ¶¶ 9-11; *see also id*. at ¶ 12 (explaining that the released materials have furthered ABC's "programmatic interests *in informing the public about* the need to develop wind power in a bird-

---

[1] *See also id*. ("Other documents released as a result of the Court's summary judgment ruling reflect FWS's calculations for potential eagle mortality at a particular wind power project. Along with other information available to ABC this information will contribute to ABC's understanding of how the Service and/or project developers are attempting to assess and eliminate the impact that projects will have on local eagle populations, a matter of substantial public and scientific controversy as wind power increasingly expands into eagle habitats throughout the country.").

friendly fashion and in advocating to policymakers in as informed a way as possible") (emphasis added).  Insofar as ABC has explained the public interest in the specific disclosures that even Defendants concede occurred "*as a result of the litigation* as opposed to the filing of a document request," Def. Resp. at 7 (emphasis in original), there is nothing more that ABC must, or could reasonably be expected to demonstrate to establish that it is entitled to, as well as eligible for, a fee award.  *See Piper v. U.S. Dep't of Justice*, 339 F. Supp. 2d 13, 21 (D.D.C. 2004) (Although the "impact on the public of releasing" certain information concerning FBI operations was "not quantifiable, the Court nevertheless [found] that it adds to the public's fund of knowledge," thereby supporting a fee award.); *Northwest Coalition for Alternatives to Pesticides v. Browner*, 965 F. Supp. 59, 63-64 (D.D.C. 1997) (awarding fees where the release of certain pesticide information would "add to the fund of information available to the public concerning potentially toxic chemicals").

> **B.** **Defendants' Assertion That The Other Post-Litigation Document Releases Had Nothing To Do With This Litigation Is Not Supported By Defendants' Declarations And Is Contrary To The Record.**

Although it is unnecessary for the Court to address the three additional document disclosures that occurred during the litigation, Defendants' contention that those disclosures have no bearing on the Court's assessment of ABC's entitlement to fees is, in any event, baseless.  While it is correct that, without more, the "'mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation'" for the purposes of supporting a fee award, Def. Resp. at 5 (quoting *Weisberg*, 745 F.2d at 1496), that is hardly the situation in this case with the post-litigation disclosures that did not directly result from court orders.

1.  **Defendants Release of Records Withheld on Exemption 7(a) Grounds *After* Plaintiff Moved for Summary Judgment**

First, and most obviously, the "release of documents withheld under Exemption 7(a)" not only occurred "*shortly after the filing of plaintiff's motion for summary judgment*" concerning those records, as Defendants admit, Def. Resp. at 6 (emphasis added), but it also occurred *after Defendants themselves moved for summary judgment on all of the documents then remaining at issue, including the Exemption 7(a) documents subsequently disclosed.  See* ECF No. 23.

Indeed, although Defendants' November 22, 2013 motion for summary judgment did not *brief* the Exemption 7(a) issue, the *Vaughn* Index accompanying Defendants' motion *did* include those documents, and asserted that they were being properly withheld on the basis of that exemption and more specifically on the ground that their release, *as of that date*, "may interfere with enforcement proceedings." ECF No. 22-9, at 20-22.  Only after Plaintiff *then* moved for summary judgment strenuously challenging the Exemption 7(a) claims, *see* ECF No. 26-1 at 15-18 (explaining that Defendants had completely failed to explain how the disclosure of documents *dating from 2010 or earlier* could interfere with any ongoing law enforcement investigations) – and *before* Defendants had to respond to that motion – did Defendants disclose all of the documents that had previously been withheld on Exemption 7(a) grounds.

Accordingly, on this record and with this chronology, the notion that Plaintiff's lawsuit and in particular their pending summary judgment motion had *nothing* to do with the release of the documents previously withheld on Exemption 7(a) grounds defies credulity as well as the case law concerning causation.  *See, e.g., American Civil Liberties Union v. U.S. Dep't of Homeland Security*, 810 F. Supp. 2d 267, 276 & n.3 (D.D.C. 2011) (finding that the litigation chronology supported a finding that the "litigation substantially caused the defendants to release

some records," and specifically noting that one release "*came less than one month after the plaintiff had moved for summary judgment*") (emphasis added); *Calypso Cargo Limited*, 850 F. Supp. 2d at 4 (explaining that "an agency cannot prevent an award of attorneys' fees simply by releasing the requested information before the plaintiff obtains a court order").

Tellingly, Defendants' own declaration does not even support the counterintuitive proposition that the litigation was unrelated to Defendants' abrupt reversal of position. Rather, the Declaration of Melanie Ikenson (Defendants' Exhibit 1) acknowledges that "on January 14, 2014" – i.e., *three weeks after Plaintiff had filed their motion for summary judgment* contesting the validity of the Exemption 7(a) withholdings**,** *see* ECF No. 26–1 at 10, 14, 16-18 – a FWS law enforcement agent "*in consultation with the United States Department of Justice*, determined that it was no longer necessary to withhold the nine documents under Exemption 7(a) . . . ." ECF No. 49-1 at ¶ 9 (emphasis added).

Plainly, however, the *only* conceivable reason why the Department of Justice was even "consulting" with the FWS concerning these documents was because of Defendants' need to respond to Plaintiff's pending motion challenging the lack of any evidence of an ongoing law enforcement proceeding concerning events that had taken place many years earlier. Indeed, Defendants have not even intimated any other reason why the exempt nature of these documents would have been under review in January 2014 but for the pendency of Plaintiff's case and the imminent prospect of a judicial order finding that Defendants had failed to establish any basis for withholding under Exemption 7(A). Consequently, the surrounding factual circumstances, common-sense, and even Defendants' own declaration, support a finding that this litigation was a triggering factor in the disclosure to ABC of documents that had been withheld for many years

on Exemption 7(a) grounds until Plaintiff moved for summary judgment with respect to them.[2]

Because Defendants' position concerning the documents withheld on Exemption 7(a) grounds is predicated entirely on their baseless causation argument, they advance no argument whatsoever that the *substance* of the released documents does not support ABC's entitlement to fees. Consequently, the only information before the Court on that issue is supplied in ABC's declaration, which explains that these "materials contained additional information that enhances ABC's ability to learn and educate the public about impacts of wind power projects on wildlife, as well as the Service's evolving efforts to address such under . . . wildlife protection laws." ECF No. 46-1 at ¶ 8. Indeed, the Schroeder Declaration provides specific examples of how these materials bear on "a public policy issue of significant and ongoing interest to ABC and other members of the public," including documents discussing the "adverse impact that some wind power projects may be having on military training routes and radar paths, and specifically how 'windfarms could push migratory paths of birds over into training airspace' needed by the military" – matters of legitimate public concern and interest. *Id*.

---

[2] It is also noteworthy that the Ikenson Declaration is in tension with the underlying record on which it purports to rely. Although the declaration refers to a January 14, 2014 "consultation" with a FWS agent in which it was determined that it was "*no longer* necessary" to withhold the documents for which Exemption 7(a) had been claimed – suggesting that until very recently it *had* been "necessary" to withhold them to safeguard an active law enforcement investigation – Defendants did not file any such "consultation" document with the Court. Rather, Defendants provided the "consultation" record to ABC only after ABC requested it, albeit with one section redacted on attorney-client grounds. *See* Pl. Ex. D. The unredacted portion does *not* contain the "no longer necessary" language or any other verbiage suggesting that the documents had been important to an active law enforcement investigation until very recently. Rather, it merely says that the release of the documents "*will not be detrimental or interfere with ongoing enforcement proceedings*," *id*. (emphasis added) – which is precisely the legal position that *ABC* took in its pending summary judgment motion. That *reinforces* the fact that Defendants' decision to reverse course and release the documents was obviously a direct result of this litigation rather than some (unidentified) external event unrelated to it.

### 2. Defendants' Disclosure Of Region Six Records That Had Been Withheld Prior To the Litigation

Defendants' position regarding the August 16, 2013 release of Region Six records that had been *withheld* from ABC prior to the initiation of litigation, but were released to them shortly following the filing of the complaint, is likewise impossible to reconcile with the facts, basic logic, or the unequivocal requirements of the FOIA.

As explained previously, the FWS had denied ABC's request for these documents in *September 2012* and ABC had filed a timely administrative appeal on October 26, 2012. *See* ECF No. 46-1 at ¶ 6. Under the unequivocal requirements of the FOIA, Defendants were obligated to resolve ABC's administrative appeal *within twenty working days*, *see* 5 U.S.C. § 552(a)(6)(A), i.e., by November 22, 2012. In the absence of such a timely resolution, ABC had a statutory right to proceed to Court for relief in lieu of awaiting a response to their administrative appeal. *Id*. When ABC did finally file suit on June 14, 2013, a response to their administrative appeal was *seven months past the statutory deadline* and Defendants had not given ABC any indication that a response would be forthcoming any time soon.

Nonetheless, Defendants would have the Court believe that when Defendants reversed course on the withholding of the Region Six documents and released them to ABC on August 16, 2013 – just two months after ABC filed this litigation and *two weeks after Defendants filed their Answer*, *see* ECF No. 11 – that the release had nothing to do with this litigation and everything to do with the administrative appeal, which was then *nine months* past the statutory deadline for a response. Under comparable circumstances, courts have been justifiably skeptical of agency representations that post-litigation disclosures of previously withheld documents had nothing to do with the litigation. *See, e.g., Rosenfeld v. U.S. Dep't of Justice*, 904 F. Supp. 2d 988, 997

(N.D. Cal. 2012) (holding that where the plaintiff had filed a timely administrative appeal and thereby exhausted administrative remedies, and the agency had failed to respond within the time frame required by FOIA, the plaintiff established that the litigation had a "substantial causative effect on the release of the documents" at issue) (internal quotation omitted).

Moreover, Defendants' declarations do not support the farfetched notion that the long delayed administrative appeal, rather than the pendency of a federal lawsuit, triggered the release of the Region Six documents. In fact, the Declaration of Antoinette Urioste (Defendants' Exhibit 3) does not even purport to explain *why* the administrative appeal was not resolved within, or remotely close to, the time frame mandated by Congress. Instead, the declaration reflects disregard for the statutory timetable, indicating that the "Department of Interior's FOIA Appeals Office" did not even contact the FWS "with instructions" for addressing the issues raised in the appeal until February 27, 2013 – *more than three months after the statutory deadline for resolving the appeal*. ECF No. 49-3 at ¶ 6. No justification whatsoever is offered in the Declaration for such a lengthy, unlawful delay.

Equally troubling is the acknowledgement in the Urioste Declaration that, months *before* ABC filed suit, the FWS had determined that there *were* "responsive documents" that should have been provided to ABC, but that these documents were inexplicably withheld from ABC until *after* the lawsuit was filed. The Declaration states that in March 2013 two company submitters of documents with "information such as[] bird and bat monitoring and fatality reports" had told the FWS that "their document[s] [were] *releasable*." *Id.* at ¶¶ 14, 15

(emphasis added).[3] Yet Defendants nevertheless *withheld* these and other Region Six documents from ABC until *after* ABC was compelled to file suit in order to obtain them. Especially under these unusual circumstances, Defendants' insistence that ABC's lawsuit had nothing to do with the belated release of the documents and instead that the administrative appeal that should have been resolved nine months earlier was solely responsible is, at the risk of understatement, implausible. *See, e.g., Public Law Education Institute v. U.S. Dep't of Justice*, 744 F.2d 181, 184 n.5 (D.C. Cir. 1984) (stating that "the temporal relation between an FOIA action and the release of documents may be taken into account in determining the existence *vel non* of a causal nexus"); *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 2009 WL 1743757, at *3 (D.D.C. 2009) (explaining that the timing of document release in the course of litigation is "certainly a salient factor" in assessing causation).

Again, other than proffering their causation argument, Defendants advance no reason why the post-litigation release of the Region Six documents may not lend still more support to ABC's fee request. ABC's Vice President has explained that the Region Six documents released on August 16, 2013 "include[s] lengthy post-construction monitoring reports for two operating wind power projects in South Dakota" and that "[a]mong other valuable information, these documents contain estimates of birds and bats killed by the turbines, which are useful in ABC's efforts to compare wildlife mortality estimates at various wind projects in our ongoing efforts to understand how siting influences mortality, the thoroughness with which various companies are

---

[3] In fact, the underlying communications from the companies demonstrate that the companies did not believe the documents contained *any* confidential information that warranted their withholding. *See* Pl. Ex. E (3/21/13 e-mail stating that one company is "OK with [FWS] releasing" the document and that "[n]o information in this letter is deemed confidential business

attempting to monitor for and address such impacts, and other issues relevant to the development of a sound policy for avoiding and minimizing impacts where possible," ECF No. 46-1 at ¶ 6 – again, the very kinds of public policy issues that this and other court have recognized the FOIA was centrally designed to shed light on.  *See Nix v. United States*, 572 F.2d 998, 1007 (4th Cir. 1978) (fees should be awarded where it would "encourage fulfillment of the purposes of the FOIA").

### 3. Defendants' Release Of The Office of Secretary Records Shortly After The Initiation of Litigation

Finally, the facts surrounding the August 15, 2014 release of Office of Secretary records concerning the controversial FWS regulation authorizing eagle deaths at wind power and other projects provides yet more support for a fee entitlement finding.  Not only did the release of these documents also occur shortly after Defendants' Answer was filed in this lawsuit and just one day before the Region Six release – strongly suggesting a coordinated disclosure to ABC tied to this litigation rather than yet another uncanny "coincidence," Def. Resp. at 6 – but the facts set forth in Defendants' declarations again support ABC's contention that this litigation was instrumental in the document disclosure.

As indicated in the Declaration of Clarice Julka (Defendants' Exhibit 2), ABC's request for these documents was submitted on March 29, 2013.  *See* ECF No. 49-2 at ¶ 4.  Under the statutory deadlines, Defendants were required to respond within no more than twenty working days, i.e., by April 26, 2013.  *See* 5 U.S.C. § 552(a)(6)(A)(i) (each agency "shall" respond to FOIA requests within this period).  Even if there had been "unusual circumstances" as defined by

---

information" and 3/22/13 e-mail explaining that another company "has no objection to the information being released").

the Act justifying some delay – which there were not – Defendants could not have lawfully extended the deadline by any "more than ten working days." *Id*. at § 552(a)(6)(B)(i).

However, by the time ABC filed its complaint in this Court on June 14, 2013, a response to the request had already been delayed by more than a month and a half past the statutory deadline. The Julka Declaration contains no explanation for why a response to the request could not have been provided within the time frame required by law. Remarkably, the Declaration does not even set forth the sort of "generic statement" of a backlog or resource inadequacy that courts have deemed *insufficient* to demonstrate that justifiable processing delays, rather than the initiation of litigation, triggered the release of records. *Electronic Privacy Info. Center v. U.S. Dep't of Homeland Security*, 811 F. Supp. 2d 216, 232-33 (D.D.C. 2011). Under these circumstances, Defendants' release of the records very shortly after their Answer was filed in this case – and only ten days after the DOI office that released the records was "notified" about the lawsuit, ECF No. 49-2 – strongly supports an inference that this litigation played a role in the release of the records.[4]

Again, Defendants have placed all of their eggs in the causation basket, and hence make

---

[4] *See, e.g., Electronic Privacy Info. Center*, 811 F. Supp. 2d at 232-33 (When there was a five month delay between the plaintiff's request and the production of documents, and the agency then disclosed a large number of documents within a month after suit was filed, the "court conclude[ed] that the plaintiff obtained relief with regard to the non-exempt records by catalyzing a voluntary change in [the agency's] conduct."); *Electronic Privacy Info. Center v. U.S. Dep't of Homeland Security*, 999 F. Supp. 2d 61, 67 (D.D.C. 2013) (holding that "common-sense" supported the proposition that the plaintiff had "substantially prevailed" where "[a]fter producing nothing in response to EPIC's FOIA request for approximately eight months, [the agency] released hundreds of responsive documents within three weeks of receiving EPIC's complaint"); *cf. Jarno*, 365 F. Supp. 2d at 740 (where Defendant failed to comply with FOIA's "statutory time frame" and the agency had "not presented the Court with a reasonable basis in law for not responding to Plaintiff's FOIA request" before litigation was filed, that supported the request for attorney's fees).

no effort to argue that the Office of the Secretary records released on August 15, 2013 did not meaningfully contribute to public understanding and the debate about an important public policy issue, as they in fact did. *See* ECF No. 46-1 at ¶ 7 ("Because these records bear directly on the formulation of a policy of tremendous importance to the public – i.e., the extent to which wind power and other projects should be authorized by the federal government to kill and otherwise take bald and golden eagles, documents released to ABC have been disseminated to the public and the media, as well as to Congressional committees concerned about whether and how the FWS is applying [federal wildlife conservation statutes] to wind power projects.").

In sum, although the releases of documents resulting directly from Court orders are alone sufficient to establish both eligibility and entitlement to a fee award, there is no valid reason why the Court may not also take the other post-litigation releases into account in considering the propriety of an award.

## II.     ABC'S REQUEST IS REASONABLE

With regard to the rates sought by ABC, Defendants do not dispute that ABC's lead counsel is a leading practitioner in and expert on FOIA litigation. Nor do Defendants even contend that the relatively modest rates being sought for his or the other counsel's time are unreasonable. Rather, Defendants criticize ABC's reference to the *Laffey* matrix, although ABC expressly did *not* attach controlling significance to that matrix, *see* Pl. App. at 16 (citing cases in this Circuit for the proposition that these rates may be referred to as a "useful starting point"), and essentially sidestep the two *principal* grounds on which ABC based its proposed rates.

First, Defendants ignore the fact that the requested rates here are significantly *lower* than those that were very recently held to be reasonable by this court for attorneys with equivalent

experience in federal court litigation.  *See* Pl. App. at 16 (citing *Taylor v. Republic Services, Inc.*, No. 1:12-cv-00523, 2014 U.S. Dist LEXIS 11086, at *11-15 (E.D. Va. Jan. 24, 2014)).  Defendants do not mention *Taylor*, let alone explain why its detailed explication of prevailing rates for attorneys with various levels of experience in federal court litigation is not directly applicable here.  Rather than reinvent the wheel discussed at length in *Taylor*, ABC has reasonably sought to abide by the Supreme Court's admonition that parties should endeavor to avoid turning a "request for attorney's fees" into a "second major litigation."  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

Second, Defendants are wrong in saying that ABC has not proffered any specific evidence that the rates sought here are reasonable in view of the prevailing market rates.  In fact, ABC has done precisely what Defendants assert is required, i.e., submit a declaration by a reputable and knowledgeable attorney practicing in this area who is "'familiar both with the skills of the fee applicants and more generally the type of work in the relevant community.'"  Def. Resp. at 8 (quoting *Robinson v. Equifax Information Services*, *LLC*, 560 F.3d 235, 244-45 (4th Cir. 2009)).  Defendants do not dispute that Stephen Braga, who is now a Professor at the University of Virginia and has practiced in this region for 31 years, and is "extremely familiar with the market rates" in this jurisdiction.  Nor do they dispute that he is familiar with the "skills of the fee applicants here" or with FOIA litigation "in the relevant community."  *Id.*

In fact, Mr. Braga's Declaration specifically attests to Mr. Glitzenstein's expertise in FOIA litigation and states that "[b]ased on [Mr. Braga's] personal understanding of the legal market in Northern Virginia *and specifically in Alexandria*" the rates being sought here "are consistent with *or lower than rates charged by attorneys in this area with equivalent levels of*

*seniority and experience.*" ECF No. 46-3 at ¶ 6 (emphasis added). Other than characterizing Mr. Braga's Declaration as "conclusory," Defendants do not indicate what more he needed to say, especially in light of Defendants' failure even to argue that he is *wrong*, or to suggest any other rates that *should* be applied.[5]

Equally meritless is Defendants' objection to the hours claimed. Defendants do not dispute that ABC's attorneys maintained contemporaneous time record that clearly reflect the amount of time they actually spent on various tasks in litigating this case, which was fully briefed and argued on summary judgment. *See Hensley*, 461 U.S. at 433 ("the most useful starting point for determining the amount of a reasonable fee" is the actual "evidence supporting the hours worked"). Rather, Defendants summarily assert that an attorney with Mr. Glitzenstein's "experience and expertise" should not have spent certain amounts of time on various topics, without explaining why the amounts were in fact unreasonable. Def. Resp. at 10.

---

[5] Defendants complain that ABC's lead counsel "does not disclose his usual billing rate," Def. Resp. at 8, but as already made clear in ABC's declarations, Plaintiff's counsel are public-interest attorneys who routinely represent non-profit organizations like ABC, and who therefore intentionally charge far *below* market rates so that litigation such as this may be pursued. *See* ECF No. 46-2 at ¶ 2 (Glitzenstein Decl.) (explaining that Meyer Glitzenstein & Crystal ("MGC") represents non-profit organizations in "public-interest litigation under the FOIA and other open government laws" and that "MGC routinely charges its clients well below market rates for its work, as in this case, so that non-profit organizations can pursue litigation they would otherwise be unable to undertake"); ECF No. 46-3 at ¶ 5 (Braga Decl.) ("MGC represents non-profit organizations in environmental and open government litigation and, in doing so, MGC often performs pro bono work and never charges anything close to the market rate that could be charged by attorneys with equivalent experience"). It is well-established that "public-interest attorneys may be awarded reasonable fees calculated 'according to the prevailing market rates in the relevant community.'" *Northwest Coalition for Alternatives to Pesticides v. EPA*, 421 F. Supp. 2d 123, 129 (D.D.C. 2006) (quoting *Blum v. Stenson*, 465 U.S. 886, 896 (1984)) (fees awarded based on prevailing rate whether plaintiff is represented by private or nonprofit counsel); *see also American Canoe Ass'n v. U.S. EPA*, 138 F. Supp. 2d 722, 740-41 (E.D. Va. 2001) ("fee awards for nonprofit legal services organizations should be based on prevailing market rates").

For example, Defendants assert that Mr. Glitzenstein should not have spent fifteen hours (i.e., less than two work days) to prepare for a summary judgment hearing, without explaining why it is an unreasonable amount of time to review the briefs, declarations, and other voluminous background materials, read all of the relevant case law in this and other jurisdictions, and otherwise prepare for a summary judgment hearing in federal court – a hearing that resulted in the Court's determination to conduct an in camera review rather than immediately grant summary judgment for Defendants, as the government requested. As this example shows, merely asserting, without more, that hours were not "reasonably expended" is not a valid basis for reducing a fee award. *Hensley*, 461 U.S. at 434.

That is especially true in this case, in which ABC has *already* voluntarily excluded 55 hours of attorney time for which recovery could have been sought. *See* Pl. App. at 13. Defendants disregard that salient fact and instead focus on a handful of time entries, particularly those relating to approximately thirteen total hours in attorneys' time that was spent preparing a motion for a *Vaughn* index before ABC was able to reach agreement with Defendants on a schedule that eliminated the need for ABC to burden the Court with such a motion. *See* Supplemental Declaration of Eric R. Glitzenstein (Pl. Ex. F) at ¶ 2. There is no reason, and Defendants have presented none, why ABC's reasonable expenditure of time on a task as critical to the pursuit of this FOIA case as expediting the production of a *Vaughn* index cannot be part of a fee award because ABC was ultimately able to persuade Defendants to agree on a schedule that avoided the need for Court intervention on that issue.[6]

---

[6] Defendants also cite several cases that stand for a proposition that work "performed during administrative proceedings prior to litigation is not recoverable under FOIA." Def. Resp. at 7

Finally, Defendants do not disagree that fees for time spent on the fee application itself may be compensated, but they complain about the specific time expended while disregarding the fact that ABC *already* voluntarily reduced their request by 20% from the time actually expended. *See* Pl. App. at 13. ABC's lead counsel has spent another 18 hours on this reply, *see* Pl. Ex. F at ¶ 1, which ABC is also willing to reduce by 20% (to 14.4 hours) in the exercise of billing judgment, thus yielding an additional recovery of $ 7,344 at the rate for which recovery is being sought.

## CONCLUSION

The American Bird Conservancy, which pursued this FOIA case vigorously in order to secure as much non-exempt information as possible on an important matter of public policy, is both eligible for and entitled to a fee award and cost award. Accordingly, for the foregoing reasons, ABC respectfully requests that the Court award it $ 122,240 in fees – i.e., the amount previously sought added to the amount sought for this reply – along with $ 2,579 in compensable costs, to which Defendants have not objected.

Respectfully submitted,

/s/ Michelle Sinnott
Michelle Sinnott (Va. Bar No. 85563)
Eric R. Glitzenstein (admitted *pro hac vice*)

Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700

---

(internal quotation omitted). As reflected in ABC's time records, ABC is not seeking compensation for *any* time expended on any administrative proceedings.

            Washington, D.C.  20009
            Phone: (202) 588-5206
            Fax: (202) 588-5049
            Email: eglitzenstein@meyerglitz.com
               msinnott@meyerglitz.com

Date: October 9, 2014       Counsel for Plaintiff