IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| AMERICAN BIRD CONSERVANCY, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|        v. | ) | Case No. 1:13-cv-723 |
| | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| *et al.,* | ) | |
|     Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

At issue in this now-concluded Freedom of Information Act[1] ("FOIA") case is plaintiff's

motion for attorney's fees, which raises the following issues:

(1) Whether plaintiff is eligible to recover attorney's fees under FOIA.
(2) Whether plaintiff's filing of the complaint or plaintiff's litigation efforts in this case caused defendants' disclosure of previously-withheld documents.
(3) If so, whether the nature of the documents that plaintiff's litigation efforts caused to be disclosed warrants an award of attorney's fees, and, if so, the amount of that award.

As the parties have fully briefed and argued these issues, they are now ripe for resolution.

**I.**

A more complete recitation of facts and procedural history of this FOIA dispute may be

found in the Order that resolved the parties' cross-motions for summary judgment.[2]   For

purposes of the motion at bar, the following facts are sufficient.

---

[1] 5 U.S.C. § 552(b).

Plaintiff American Bird Conservancy ("ABC") is a non-profit organization that seeks to conserve native birds and their habitats in the Americas through scientific research, analysis, and advocacy. One of plaintiff's advocacy and research programs, the "Bird-Smart Wind Program," is aimed at addressing threats to birds and avian habitats caused by wind energy development. In furtherance of this program, plaintiff seeks to ensure that the federal government minimizes the adverse impact on birds and their habitats during the construction and operation of wind energy facilities. The federal defendants in this case are the U.S. Department of the Interior ("DOI") and the U.S. Fish and Wildlife Services ("FWS"). FWS is a bureau within DOI that seeks to guide conservation, development, and management of America's fish and wildlife resources. DOI is a Cabinet-level agency responsible for managing America's natural and cultural resources.

Plaintiff's motion for attorney's fees focuses on plaintiff's series of three FOIA requests and defendants' responses to those requests, including the disclosure of documents during the pendency of this litigation. Plaintiff's **first** FOIA request, submitted on April 5, 2011, sought "full copies of all documents relating to mortality of birds and bats at wind farms in Kenedy County, Texas . . . and FWS internal and external correspondence about bird and bat mortality at wind farms in Kenedy County, Texas." On April 14, 2011, plaintiff sent three additional FOIA requests to FWS regional offices requesting more records pertaining to proposed and constructed wind power facilities. These requests sought studies of potential bird and bat impacts for the proposed projects, bird and bat mortality data regarding the proposed and constructed projects, and correspondence between FWS and its project developer concerning bird and bat impacts of

---

[2] *American Bird Conservancy v. U.S. Fish and Wildlife Service, et al.*, No. 1:13cv723 (E.D. Va. June 24, 2014) (Doc. 41) (Order) (hereinafter "Summary Judgment Order").

these projects. In response, FWS released a number of documents responsive to this FOIA request, but withheld certain documents pursuant to several FOIA exemptions. Specifically, twenty-nine documents from FWS Region Two were withheld based on FOIA Exemptions 4, 5, 6, and 7(A); twenty-eight documents from FWS Region Three were withheld based on FOIA exemptions 4 and 5; and nine documents from FWS Region Six were withheld based on FOIA exemptions 4 and 6.

Plaintiff's **second** FOIA request was submitted on June 28, 2012 to the FWS Division of Information Resources and Technology Management in Arlington, Virginia for "review comments from FWS regional and local offices regarding the drafts of the FWS Land-Based Wind Energy Guidelines" and "interagency review comments regarding the drafts of the FWS Land-Based Wind Energy Guidelines" from agencies other than FWS. On April 10, 2013, FWS released a number of documents responsive to this request, but withheld two documents in their entirety based on FOIA Exemption 5. The withheld documents were (1) the comments on the Council on Environmental Quality on the draft Guidelines, and (2) the comments of the Office of Management and Budget on the draft Guidelines.

Plaintiff's **third** FOIA request was submitted on March 29, 2013 to the FWS Division of Information Resources and Technology Management in Arlington, Virginia and to the Office of the Secretary of the Interior for records of FWS internal meetings concerning "a proposed rule that would dramatically increase the duration of Eagle Act take permits" and also requested "the FWS guidance document used by wind developers seeking Eagle Act take permits."[3] Specifically, plaintiff sought "staff communications related to such meetings, including meeting

---

[3] A "take permit" is a permit issued to private, non-federal entities undertaking otherwise lawful projects that might result in the capturing or killing of an endangered or threatened species.

agendas, meeting notes, emails, and letters," as well as "records prepared for the meetings such as handouts and presentations."

On June 14, 2013, plaintiff filed the instant complaint against FWS and DOI to compel disclosure of requested records.  Two months later, on August 15, 2013, defendants released 1187 pages of records responsive to plaintiff's third FOIA request, 225 of which were redacted in part pursuant to FOIA Exemptions 5 and 6.  According to defendants, based on a sworn declaration submitted by Claire Julka, the FOIA Officer for the Office of Secretary at the Department of the Interior, the August 15, 2013 document release occurred because the "Office of the Solicitor completed its consultation concerning the records [at issue] and transferred the records . . . for release."  Julka Decl. ¶ 21.  Moreover, the Julka Declaration contends under oath that "[p]laintiff's filing of the complaint or any filings related to the complaint had nothing to do with [the] office's timing of the release."  *Id.* ¶ 24.   One day later, on August 16, 2013, FWS released 225 pages of previously-withheld materials in six documents responding to plaintiff's first FOIA request.  As with the August 15 release, defendants declare under oath that the timing of the release was caused by the necessity of completing a consultation with the Office of the Solicitor and that "[p]laintiff's filing of the complaint or any filings related to the complaint had nothing to do with [the] office's timing of the release."  Urioste Decl. ¶ 26.

On November 22, 2013, defendants filed a motion for summary judgment with respect to the remaining documents at issue.  Plaintiff filed both an opposition to defendant's motion and a cross-motion for summary judgment on December 23, 2013.  While the summary judgment motions were pending, on January 16, 2014, FWS released all of the Kenedy County documents that had previously been withheld on the basis of Exemption 7(A) grounds in response to plaintiff's first FOIA request.  This release consisted of 9 documents and 38 pages of additional

4

material. According to the sworn declaration of Melanie Ikenson, Program Analyst and FOIA Coordinator for the Southwest Region of FWS, on "January 14, 2014 . . . Law Enforcement Field Agent Alejandro Rodriguez, in consultation with the United States Department of Justice, determined that it was no longer necessary to withhold the nine documents withheld under Exemption 7(A) on September 14, 2012." Ikenson Decl. ¶ 9. Importantly, Ms. Ikenson also noted that

> [t]his changed withholding determination was not related to the [p]laintiff's FOIA litigation. Instead, the changed withholding determination was due to the evolution of the investigation between September 14, 2012 and January 14, 2014. As of January 14, 2014, [FWS] in consultation with the United States Department of Justice, determined that the underlying law enforcement matter would not be further pursued and therefore determined the release of the subject documents was appropriate.

*Id.*

On February 21, 2014, following briefing and argument on the parties' cross-motions for summary judgment, an Order issued taking the summary judgment motions under advisement and directing defendants to submit the documents still at issue for *in camera* review.[4] In the course of submitting the documents for *in camera* review, defendants released parts of 4 additional documents in response to plaintiff's third FOIA request on May 6, 2014.[5]

Finally, on June 24, 2014, the Summary Judgment Order issued, recording the results of the *in camera* review. Specifically, the Order granted defendants' motion in part, finding that FOIA Exemptions 4 and 5 were validly applied to the following documents:

1. FWS Region Two documents 2, 3, 5, 18 with the exception of the first paragraph, 19-21, 28, and 29;

---

[4] *American Bird Conservancy v. U.S. Fish and Wildlife Service, et al.*, No. 1:13cv723 (E.D. Va. Feb. 21, 2014) (Doc. 32) (Order).

[5] Several Orders issued specifying the form in which defendants needed to submit the relevant documents to facilitate *in camera* review.

2. FWS Region Three documents 2, 6-16, 20, and 22-28;

3. FWS Region Six documents 1-6 and 9;

4. Office of Management and Budget and Counsel on Environmental Quality Comments documents 1 and 2; and

5. Office of the Secretary documents 1-3, 6-10, 12, 13, 15-17, 19, 21-23, 25-28, 32, and 33.[6]

Defendants' motion was denied in all other respects. At the same time, plaintiff's motion for summary judgment was also granted in part, with the Order directing defendants to release the following documents to plaintiff;

1. FWS Region Two document 18, first paragraph only;

2. FWS Region Three documents 1, 3-5, 17-19, and 21; and

3. Office of the Secretary documents 24 and 29.[7]

Plaintiff's motion was denied in all other respects.

Given these facts, plaintiff seeks attorney's fees with respect to the following document releases:

(1) The August 15, 2013 release of 1187 pages responsive to plaintiff's third FOIA request.

(2) The August 16, 2013 release of 225 pages responsive to plaintiff's first FOIA request.

(3) The January 16, 2014 release of 9 documents and 38 pages responsive to plaintiff's first FOIA request.

(4) The May 6, 2014 release of parts of 4 additional documents responsive to plaintiff's third FOIA request.

(5) The documents defendants were ordered to release pursuant to the Summary Judgment Order on June 24, 2014, consisting of 10 documents and a paragraph of an additional document.

## II.

The FOIA provides that courts "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). And a complainant has substantially

---

[6] Summary Judgment Order at 13-14.

[7] *Id.* at 14.

prevailed "if the complainant has obtained relief through either– (I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii). Importantly, an "award of attorney's fees is not automatic, but is to be made where doing so will encourage fulfillment of the purposes of FOIA." *Nix v. United States*, 572 F.2d 998, 1007 (4th Cir. 1978).

The majority of courts evaluating FOIA attorney's fees disputes utilize a two-step analysis to determine whether an award of attorney's fees is warranted. First, it must be determined whether the plaintiff is "eligible to receive attorney's fees and costs," that is, whether the plaintiff substantially prevailed within the meaning of the statute. *Jarno v. Dep't of Homeland Sec.*, 365 F. Supp. 2d 733, 737 (E.D. Va. 2005) (citing *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1093 (D.C. Cir. 1992)). *If* a plaintiff succeeds on the eligibility prong, "he must then show that he is entitled to the fees and costs." *Id.* The eligibility and entitlement prongs steps must be separately addressed.

## A.

The parties do not dispute that plaintiff is eligible for an attorney's fees award, given that plaintiff obtained relief through a "judicial order," *i.e.* the Summary Judgment Order. But the parties sharply dispute the *extent* of that eligibility. Specifically, plaintiff contends that in addition to the documents released as a result of the Summary Judgment Order, defendants' document releases that occurred after plaintiff filed its complaint and summary judgment memoranda were voluntary changes in defendants' position caused by plaintiff's litigation, thereby making plaintiff eligible to recover attorney's fees for those document releases. Defendants respond by submitting declarations to the effect that these document releases were

prompted by the completion of internal investigations and were not caused in any way by plaintiff's pending FOIA litigation. In other words, defendants deny that there is a causal relationship between plaintiff's lawsuit and the document releases at issue. Resolution of this dispute is critical because it determines the universe of documents on which plaintiff may be entitled to an award of attorney's fees.

The question whether plaintiff "substantially prevailed, in the absence of a final judgment in his favor, is a question of causation—the lawsuit must have resulted in the release of records that would not otherwise have been released." *Reinbold v. Evers*, 187 F.3d 348, 363 (4th Cir. 1999) (citing *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1496 (D.C. Cir. 1984)). Courts that have considered this issue have uniformly held that the "mere filing of the complaint and the subsequent release of the documents is insufficient to establish causation." *Weisberg*, 745 F.2d at 1496.[8] And the causation inquiry must take into account "whether the agency upon actual and reasonable notice of the request, made a good faith effort to search out material and to pass on whether it should be disclosed." *Weisberg*, 745 F.2d at 1496. In sum, the burden is on plaintiff to show that "the lawsuit was reasonably necessary and the litigation substantially caused the requested records to be released." *Burka v. U.S. Dep't of Health and Human Serv's*, 142 F.3d 1286, 1288 (D.C. Cir. 1998). It remains to apply these principles to the facts of this case.

### 1. August 15 and 16, 2013 Document Releases

With respect to the August 15 and 16, 2013 document releases—1187 and 225 pages, respectively—plaintiff argues that these releases meet the eligibility prong because they occurred

---

[8] *See also Public Law Educ. Institute v. U.S. Dep't of Justice*, 744 F.2d 181, 184 (D.C. Cir. 1984) ("[Plaintiff] invites us to infer causality from the timing of the release of the documents . . . Such an inference, however, would be contrary to the law of this Circuit."); *Mullen v. U.S. Army Criminal Investigation Command*, No 1:10cv262, 2012 WL 2681300 at *7 (E.D. Va. July 6, 2012) (same).

after the "initiation of litigation"[9] as plaintiff filed its complaint in June 2013. Yet, as noted, this contention is insufficient to establish the requisite causation; rather it is contrary to the sensibly-settled principle articulated in *Weisberg* to the effect that the mere filing of a complaint and subsequent release of documents is insufficient, by itself, to establish the causal link necessary to demonstrate eligibility for attorney's fees. Moreover, defendants have proffered sworn declarations that each of these document releases occurred after the completion of an internal investigation and was not influenced in any way by plaintiff's initiation of the instant litigation. Nor are these declarations mere bald assertions; they include facts that provide firm support for defendants' position. Indeed, close examination of defendants' explanations demonstrate their reasonableness.

With respect to the August 15, 2013 document release, the Julka Declaration notes that this release responded to a FOIA request submitted on March 29, 2013, and that the Department of the Interior promptly began "FOIA intake procedures" three days later on April 1, 2013. *See* Julka Decl. ¶ 6. Subsequently, various individuals in the Office of the Secretary and Fish and Wildlife Service were promptly contacted to begin searches immediately because those offices maintained the responsive records. *Id.* ¶ 8. As the Declaration notes, the responsive records were not received until July 5, 2013, and only one week later, those responsive records were transferred to the Office of the Solicitor for legal review. *Id.* ¶ 18. The Office of the Solicitor, after consultations with the United States Attorney, then determined on August 9, 2013 that the release should be made. *Id.* ¶ 22. Thus, it was not unreasonable for defendants to take four-and-a-half months to respond to plaintiff's FOIA request, especially considering the volume of the documents to be produced (1187 pages) and the fact, as reflected in the Julka Declaration, that

---

[9] Plaintiff's Application for Attorney's Fees and Costs at 7.

prompt steps were taken to identify, review, and release the responsive documents. More importantly, the relatively short period of time in which these investigatory procedures were carried out supports the conclusion that, as the Julka Declaration notes, the eventual August 15, 2013 document release was not caused by the filing of plaintiff's complaint. In sum, plaintiff has adduced no evidence or advanced any persuasive reason to doubt or contradict the Jullka Declaration's explanation as to why defendants' internal investigation surrounding the August 15, 2013 document release was not caused by the filing of plaintiff's complaint.[10]

As for the August 16, 2013 document release, plaintiff contends that because it filed an administrative appeal on October 26, 2012 following a September 2012 denial of plaintiff's FOIA request and did not receive a response regarding the appeal until after the filing of the complaint in June 2013—well-outside the statutorily mandated response time of twenty working days—that the complaint had a causal effect on the release of the August 16, 2013 documents that were the subject of the administrative appeal. On close examination, however, defendants have again proffered a legitimate reason for the timing of this document release that is unrelated to plaintiff's initiation of this lawsuit.

According to the Urioste Declaration, the FWS received a FOIA appeal notification from the DOI's FOIA Appeals Office in February 2013 regarding plaintiff's administrative appeal. Urisote Decl. ¶ 6. Immediately, in compliance with the appeal, an additional search for relevant

_____

[10] Although plaintiff asserts that defendants failed to respond to the March 29, 2013 FOIA request within twenty working days as required by the statute, a factor plaintiff contends is indicative of a causal link between the filing of plaintiff's complaint and the August 15, 2013 document release, the Julka Declaration contradicts this assertion by noting that plaintiff received a timely response within 4 days of submitting its FOIA request. *See* Julka Decl. ¶ 10 ("On April 3, 2013, my office emailed the requester and attached a copy of the acknowledgment letter."). Indeed, the statute simply requires an agency to determine within 20 days whether or not the agency will "comply with such request"; it does not require that the actual documents themselves be released in the 20-day period. 5 U.S.C. § 552(a)(6)(A)(i).

documents was conducted, and field personnel identified seven responsive documents that were not previously provided to the requester. *Id.* ¶ 8. Four of these documents, however, were submitted by non-governmental entities, and from March 2013 until July 2013, the FWS sent several emails querying representatives of these entities to ascertain whether the entities objected to releasing the documents at issue. *Id.* ¶¶ 14-23. Only after this process was completed did the FWS then consult with the Office of the Solicitor on July 8, 2013, which then approved the release of the documents on August 16, 2013. *Id.* ¶¶ 24-25. Thus, as with the August 15, 2013 document release, the timeline and nature defendants' investigatory process provides a legitimate explanation for the timing of the document release. Plaintiff argues that the fact that the appeal was only addressed in February 2013 when it was filed in October 2012 is "troubling." Although this may be troubling to plaintiff, it is unpersuasive in the causation inquiry because defendants' internal review began *before* the lawsuit was filed.  And the Urisote Declaration makes clear that once the process began in responding to plaintiff's appeal, the investigation proceeded reasonably and expeditiously.  In sum, plaintiff has failed to carry its burden of showing that that the filing of its complaint caused the release of the August 15 and 16, 2013 documents "that would not otherwise have been released." *Reinbold*, 187 F.3d at 363.

## 2.   January 16, 2014 Document Release

The January 16, 2014 document release presents a closer question that must ultimately be resolved in favor of plaintiff.  With respect to this production, plaintiff argues that this release was directly influenced by arguments plaintiff made in its summary judgment motion challenging defendants' withholding of documents pursuant to FOIA Exemption 7(A).  *See ACLU v. U.S. Dep't of Homeland Security*, 810 F. Supp. 2d 267, 276 n.3 (D.D.C. 2011) (finding that causation was present when "[t]he releases in September of 2009 came less than one month

11

after the plaintiff moved for summary judgment on August 14, 2009"). Plaintiff contends that the temporal proximity between its summary judgment filing and the January 16 release—three weeks—supports its contention that the January 16 release would not have occurred but for plaintiff's filing. Defendants respond by arguing that the decision to change the withholding determination "was due to the evolution of the investigation between September 14, 2012 and January 14, 2014." Ikenson Decl. ¶ 9. Yet, this statement by itself, however, is vague and unpersuasive, and more importantly, fails to specify *when*, during this two-year period, the decision to change the withholding determination occurred. Moreover, unlike the August 15 and 16, 2013 document releases, which occurred a full two months after plaintiff initiated this lawsuit, only three weeks separated the January 16, 2014 document release and plaintiff's summary judgment filing seeking documents from a FOIA request that had been pending since 2011. The timing of this document release, in conjunction with the fact that plaintiff's summary judgment response specifically attacked the withholding of documents on Exemption 7(A) grounds, corroborates plaintiff's contention that plaintiff's summary judgment filing was the cause of the January 16, 2014 release. Finally, it is noteworthy, as the Ikenson Declaration concedes, that this document release occurred after a consultation with the "United States Department of Justice." Ikenson Decl. ¶ 9. The fact that the determination to disclose these documents occurred after consultation with the Department of Justice—presumably including the summary judgment record—persuasively suggests that the January 16, 2014 document release was the result of reconsideration of defendants' position with respect to these documents based on plaintiff's summary judgment filing. Thus, on this record, plaintiff has carried its burden of showing that the January 16, 2014 document release occurred at least in substantial part due to plaintiff's litigation efforts, including plaintiff's summary judgment filing and supporting

memoranda. As such, disclosure of these documents also provides a basis for plaintiff's eligibility for an attorney's fee award.

### 3. May 6, 2014 Document Release

As for the May 6, 2014 document release, defendants do not offer any explanation as to why those documents were released, and it is uncontroverted that these documents were released while defendants were complying with the Orders directing them to submit documents for *in camera* review. As such, it is reasonable to conclude that plaintiff's lawsuit was also a cause of this document release.

In sum, three sets of document releases render plaintiff eligible to recover attorney's fees in this case:

1. The January 16, 2014 release of 9 documents, consisting of 38 pages of material.
2. The May 6, 2014 release of parts of 4 additional documents responsive to plaintiff's third FOIA request.
3. The documents which defendants were ordered to release pursuant to the Summary Judgment Order on June 24, 2014, consisting of 10 documents and a paragraph of an additional document.

It remains now to evaluate whether these documents entitle plaintiff to an attorney's fee award.

### B.

Whether FOIA plaintiffs are entitled to an award of attorney's fees has, unsurprisingly, generated substantial litigation. The majority of courts to address this issue evaluate four factors to determine whether awarding attorneys' fees is appropriate: (i) the public benefit derived from the disclosed documents; (ii) the commercial benefit to the complainant; (iii) the nature of the complainant's interest in the records sought; and (iv) whether the government's withholding had a reasonable basis in law. *See Reinbold*, 187 F.3d at 362 n.16; *Jarno*, 365 F. Supp. 2d at 738; *Gowan v. U.S. Dep't of Air Force*, 148 F.3d 1182, 1195 (10th Cir. 1998); *State of Texas v.*

*I.C.C.*, 935 F.2d 728, 731 (5th Cir. 1991); *Church of Scientology of California v. U.S. Postal Service*, 700 F.2d 486, 492 (9th Cir. 1983).[11] These four factors must now be applied to the facts of this case.[12]

It is settled that attorneys' fees are appropriate where a FOIA response helps protect the public's interest in the fair and just administration of justice. *See Jarno*, 365 F. Supp. 2d at 739. But importantly, the benefit to the public must be specific and concrete because "[i]t is doubtless true . . . that the successful FOIA plaintiff always acts in some degree for the benefit of the

---

[11] It appears that the four-factor test adopted by *Reinbold* and the majority of other courts is tethered to the legislative history of FOIA, as a 1974 Senate Bill expressly included these criteria as part of the statute's text before the Senate ultimately "concluded that existing case law on award of attorney fees in federal courts embodied the Senate criteria; therefore, a statement of them was unnecessary." *American Federation of Gov't Emp., AFL-CIO v. Rosen*, 418 F. Supp. 205, 208 (N.D. Ill. 1976).

Plaintiff, however, advocates adoption of a different test from *Sabalos v. Ragan*, 520 F. Supp. 1069, 1072 (E.D. Va. 1981), which condenses the four factors into "two conditions for recovering fees. The first condition is that the plaintiff had an insufficient private or pecuniary interest to justify bringing the suit without an award of fees . . . The second condition is that the government had no reasonable legal basis for withholding the requested information. If a[] FOIA suit meets *either* of these two conditions, the court should award attorneys' fees to the plaintiff." (emphasis added). Plaintiff's argument must be rejected, given that *Reinbold*, which is controlling Fourth Circuit precedent, has adopted the four-factor test, along with the majority of courts to consider this issue. Moreover, adoption of the *Sabalos* test would allow any non-profit entity to recover attorneys' fees in a FOIA suit every time the non-profit entity lacked a pecuniary or commercial interest. This conclusion undermines clear Fourth Circuit law that attorneys' fees awards in FOIA cases are not automatic. *See Nix*, 572 F.2d at 1007.

[12] The four-factor test was sharply criticized by Judge Kavanaugh in *Morley v. C.I.A.*, 719 F.3d 689, 690 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("We should ditch the four-factor standard."). Judge Kavanaugh underscored that the "four factors have no basis in the statutory text" and are furthermore "inconsistent with the structure and purposes of FOIA." *Id.* at 690-91. Judge Kavanaugh specifically objected to the first three factors in the test as contravening FOIA's status as an "equal-opportunity disclosure statute." *Id.* at 691. And Judge Kavanaugh pointed out that the public benefit factor is unworkable: "[h]ow does a judge evaluate 'public benefit' in a principled way? Doesn't this factor inevitably devolve into what the *judge* subjectively thinks is important, rather than an objective determination?" *Id.* Although many of Judge Kavanaugh's criticisms and arguments have merit, the Fourth Circuit has thus far endorsed the four-factor test and, as such, existing and binding Circuit precedent on this point must be followed here.

public." *Sabalos*, 520 F. Supp. at 1072 (internal quotation marks and citations omitted). In evaluating this factor "[t]he degree of dissemination to the press and public are recognized as important factors in determining whether a public benefit exists." *Jarno*, 365 F. Supp. 2d at 738. Thus, analysis under this factor "requires consideration of both the effect of the litigation for which fees are requested and the potential public value of the information sought . . . ." *Davy v. C.I.A.*, 550 F.3d 1155, 1159 (D.C. Cir. 2008).

Plaintiff argues that the first factor weighs in favor of an award of attorney's fees because the document releases at issue have: (i) helped plaintiff understand how to best reduce wildlife mortality rates, (ii) have informed the public about the extent to which wind power and other government projects kill bald and golden eagles, and (iii) have stimulated public debate over the proposed controversial regulations to dramatically increase the duration of permits to kill or otherwise "take" eagles at wind power and other projects. Defendants, in response, contend that plaintiff has failed to articulate, with adequate specificity, how the *public* has benefitted from the specific documents released in this litigation. Ultimately, plaintiff's argument wins the day with respect to both the January 16, 2014 and May 6, 2014 document releases, as plaintiff has carried its burden of showing that these two document releases satisfy the public benefit factor under *Reinbold*.

Specifically, according to the Schroeder Declaration, the January 16, 2014 document release of 9 documents related to the mortality of birds and bats at certain wind farms in Kenedy County, Texas contained important information for the public about "impacts of wind power projects on wildlife." Schroeder Decl. ¶ 8. As an example, the Schroeder Declaration references one document reporting an incident where biologists observed a white pelican being struck by a turbine blade in Texas, and concludes that this incident is illustrative of how "windfarms could

push migratory paths of birds over into training airspace" needed by the military. *Id.* And the Schroeder Declaration also notes that a number of the January 16, 2014 documents discuss the "FWS's potential legal mechanisms for issuing MBTA [Migratory Bird Treaty Act] permits for bird strikes by wind turbines, which is a public policy issue of significant and ongoing interest to ABC and other members of the public concerned with bird conservation, as well as to the wind power industry." *Id.* Similarly, with respect to the May 6, 2014 document release, the Schroeder Declaration highlights the documents' discussion of the "controversial eagle permitting rule" and notes that "[o]f particular interest to ABC and other members of the public is information in the released documents indicating that Service officials were aware that the meetings raised questions about potential violations of the Federal Advisory Committee Act . . . ." *Id.* ¶ 9. In sum, careful scrutiny of the Schroeder Declaration points persuasively to the conclusion that plaintiff has adequately demonstrated that the January 16, 2014 and May 6, 2014 document releases satisfy the public benefit factor in the entitlement calculus.[13]

Nor does defendants' reliance on *Mullen* compel a contrary conclusion, as in that case, the plaintiff in its petition for attorney's fees simply relied on "[g]eneral allegations of impropriety" as evidence of public benefit stemming from disclosure of documents related to two governmental investigations. *Mullen*, 2012 WL 2681300 at *9. Because it was "not obvious that the public ha[d] any general interest about the two investigations," the public benefit criterion was not met given that "[m]inimal, incidental and speculative public benefit" are insufficient to satisfy the public benefit factor. *Id.* By contrast, in this case, plaintiff, via the Schroeder

---

[13] Due to the nebulous nature of this factor, the only principled way to make a judgment as to whether the relevant documents benefitted the public, without unduly superimposing a court's subjective beliefs as to what matters are of public concern, is to rely on sworn Declarations, like the Schroeder Declaration. And defendants do not submit any contrary declarations casting doubt on, or contradicting, the Schroeder Declaration.

Declaration, has not only identified general policies implicated by the documents released which bear on matters of public interest, but also has identified specific documents that further those interests, including documents in the May 6, 2014 document release that show that government officials may have been aware of violations of a federal statute—the Federal Advisory Committee Act. In other words, the Schroeder Declaration is adequately specific to enable plaintiff to prevail on the public benefit prong of the entitlement inquiry. And although the degree of dissemination to the press is a relevant consideration in evaluating the potential public benefit of documents released to a FOIA plaintiff, it is not a requirement. Imposing such a stringent requirement that document releases receive national media attention and in-depth analysis from elected representatives is an unrealistic and onerous requirement for FOIA plaintiffs to meet, and moreover, such a requirement has no basis in the statute's text. In sum, the first factor—the public benefit of the documents—weighs in favor of entitling plaintiff to an award of attorney's fees.

The "second and third factors, which are often considered together" evaluate whether a "plaintiff has sufficient private incentive to seek disclosure without attorney's fees." *Davy*, 550 F.3d at 1160 (internal quotation marks and citations omitted). The second factor considers whether the party requesting fees was "indigent or a non-profit public group and not a large corporate interest." *Jarno*, 365 F. Supp. 2d at 739. The third factor, meanwhile, evaluates the "nature of the complainant's interest in the records sought." *Id.* at 740. Both factors are relatively straightforward in this case. It is undisputed that plaintiff is a non-profit organization, as opposed to a corporate entity, and that plaintiff's FOIA requests were submitted solely to further its non-profit goals. Indeed, no underlying profitable gain appears to have motivated plaintiff in this case. Thus, both of these factors weigh in favor of an award of attorney's fees.

The final factor in the attorney's fee analysis is "whether the government's withholding had a reasonable basis in law." *Id.* at 740. Thus, if the government's "position is correct as a matter of law, that will be dispositive. If the [g]overnment's position is founded on a colorable basis in law, that will be weighed along with other relevant considerations in the entitlement calculus." *Davy*, 550 F.3d at 1162 (internal quotation marks and citations omitted). Importantly, a "defendant's failure to produce documents due to backlog or administrative issues does not constitute a 'reasonable basis in law.'" *Jarno*, 365 F. Supp. 2d at 740. By contrast, however, "the existence of an ongoing investigation" is a reasonable basis in law to withhold documents, especially when coupled with "responsiveness to the FOIA request once the investigation . . . concluded." *Mullen*, 2012 WL 2681300 at *10.

Defendants contend that the withholding of the January 16, 2014 documents had a colorable basis in law because they invoked FOIA Exemption 7(A) as a justification for delaying the release of these documents on the basis of an ongoing investigation. But this is unpersuasive; it amounts to no more than a bald assertion that the Exemption applied. This is plainly insufficient to establish a colorable basis in law for the withholding of the January 16, 2014 documents. Indeed, had the parties litigated the application of Exemption 7(A) to these documents, defendants would have been required to disclose, under seal or *in camera*, the specific *nature* of the ongoing enforcement proceeding that justified their invocation of Exemption 7(A). And although the Ikenson Declaration states that the changed withholding determination was due to the "evolution of the investigation between September 14, 2012 and January 14, 2014," plaintiff's FOIA request had been pending since 2011, and the Declaration does not specify when or why the investigation abruptly evolved. *Id.* Absent further support for defendants' conclusory assertion that Exemption 7(A) applied to the documents at issue,

defendants' withholding of the January 16, 2014 documents cannot be said to have had a reasonable basis in law, especially considering the timing of the release, which occurred a mere three weeks after plaintiff filed its summary judgment memoranda challenging these specific documents that were the subject of plaintiff's FOIA request submitted over *two years* earlier. Also, with respect to the May 6, 2014 document release, defendants do not provide *any* facts or justification for their about-face document release of previously-withheld pages on May 6, 2014 while in the process of submitting documents for *in camera* review. In sum, on this record, defendants' withholding of the documents eventually released on January 16, 2014 and May 6, 2014 cannot be said to have had a reasonable basis in law.

Thus, all four factors in the entitlement calculus point persuasively to the conclusion that plaintiff is entitled to an attorney's fees award. It remains to now determine the magnitude of this award.

### III.

In its petition, plaintiff seeks attorney's fees in the amount of $122,240, along with costs in the amount of $2,579. Whether these amounts are appropriate in the given circumstances is determined by utilizing the well-settled lodestar methodology to adjudicate plaintiff's attorney's fee petition. *See Gisbrecht v. Barnhart*, 535 U.S. 789, 801 (2002) ("[T]he lodestar figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence.") (internal quotation marks and citations omitted).

### A.

The threshold issue in adjudicating the size of plaintiff's attorney's fee award is whether plaintiff's award should be limited solely to those litigation efforts related to the January 16, 2014 and May 6, 2014 document releases, which were the releases that were clearly caused by

plaintiff's litigation efforts and satisfy the four-factor test, or alternatively, whether plaintiff's attorney's fee award should be considered based on the overall relief plaintiff obtained in connection with the number of hours plaintiff reasonably spent on this litigation. The latter approach seems more appropriate in this case, as defendants' various document disclosures were not so unrelated so as to justify treating any of them as an entirely separate lawsuit.

On this issue, the Fourth Circuit, in *Abshire v. Walls*, 830 F.2d 1277 (4th Cir. 1987), considered an attorney's fee petition where the plaintiff prevailed on a "strip search claim" but was unsuccessful in his claims for "false arrest, false imprisonment, and malicious prosecution." *Id.* at 1282. The district court limited the plaintiff's attorney's fee award solely to those hours related to his strip search claim. On appeal, the Fourth Circuit reversed, finding that the "district court misinterpreted the Supreme Court's ruling" in *Hensley v. Eckerhart*, 461 U.S. 424 (1983). *Id.* In reaching this result, the Fourth Circuit held that, consistent with *Hensley*, where a plaintiff submits a number of claims for relief involving a common core of facts or based on related legal theories,

> [m]uch of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended in the litigation.

*Abshire*, 830 F.2d at 1282-83 (internal quotation marks and citations omitted). Thus, the Fourth Circuit concluded that it was "impossible to isolate the inquiry into the constitutionality of the strip search from the other facts" of the plaintiff's case. *Id.* at 1283. *See also Perry v. Bartlett*, 231 F.3d 155, 163 (4th Cir. 2000) ("[E]ntitlement to fees for one aspect of a protracted litigation does not turn narrowly on whether the party prevailed on that particular matter, but whether a

20

separate claim, or, as here, a separate proceeding is so unrelated as to justify treating it as a separate lawsuit.") (internal quotation marks and citations omitted).

Indeed, this principle has even more force in FOIA cases. As one district court has persuasively found, a reduction in a FOIA attorney's fee award for FOIA requests that are ultimately unsuccessful neglects "the fact that FOIA cases routinely result in the disclosure of a relatively small proportion of the documents originally requested." *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 774 F. Supp. 2d 225, 233 (D.D.C. 2011). This is so because a "FOIA plaintiff cannot know at the outset which documents are subject to exemptions and which are not" and thus, the "normal FOIA litigation process requires the plaintiff to request a broad swath of material, which will then be winnowed until the agency has released all nonexempt records." *Id.* at 233-34.

These principles applied here make clear that plaintiff's attorney's fee petition must be considered in view of the overall relief plaintiff obtained in connection with the hours plaintiff reasonably expended in connection with the present litigation. All of plaintiff's FOIA requests stemmed from a series of related claims that involved a common core of facts, namely, the defendants' withholding of documents bearing on the interaction between government policies and the endangerment of various species of birds based on those policies. Thus, none of plaintiff's litigation efforts in this case were so discrete such that there would be justification for treating any aspect of the litigation as a "separate lawsuit." *Perry*, 231 F.3d at 163. Finally, and particularly relevant to the FOIA context, although plaintiff's entitlement to attorney's fees stems only from the January 16, 2014 and May 6, 2014 document releases, respectively, plaintiff could not have known *ex ante* that these documents would be the only source of its entitlement to attorney's fees since, by definition, the contents of the released documents were unknown when

21

plaintiff initially submitted its FOIA requests. To penalize and limit plaintiff to an attorney's fee award related only for hours expended related to these document releases would be to ignore the realities of the "normal FOIA litigation process." *Judicial Watch*, 774 F. Supp. 2d at 233. In sum, plaintiff's attorney's fee petition must be considered in its entirety, and the size of plaintiff's attorney's fee award is not limited to litigation efforts specifically tied to the January 16, 2014 and May 6, 2014 document releases. And this includes time spent preparing the present fee petition, as it is "well-settled that reasonable time and expenses preparing a fee petition are compensable." *American Canoe Ass'n, Inc. v. U.S. E.P.A.*, 138 F. Supp. 2d 722, 746 (E.D. Va. 2001).

## B.

In this district, and elsewhere in this circuit, attorney's fee awards have been determined pursuant to the procedure elucidated by the Fourth Circuit in *Grissom v. Mills Corp.*, 549 F.3d 313 (4th Cir. 2008). Specifically, *Grissom* directs district courts in this circuit to (i) calculate the lodestar, which is determined by multiplying the "reasonable hourly rate" by the "hours reasonably expended," in light of the factors enumerated in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978) and *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974),[14] (ii) subtract fees for hours spent on unsuccessful claims *unrelated* to successful ones, and (iii) award some percentage of the remaining amount, depending on the degree of success enjoyed by

---

[14] These factors are: (i) the time and labor required; (ii) the novelty and difficulty of the questions; (iii) the skill requisite to perform the legal service properly; (iv) the preclusion of other employment by the attorney due to acceptance of the case; (v) the customary fee; (vi) whether the fee is fixed or contingent; (vii) time limitations imposed by the client or the circumstances; (viii) the amount involved and the results obtained; (ix) the experience, reputation, and ability of the attorneys; (x) the "undesirability" of the case; (xi) the nature and length of the professional relationship with the client; and (xii) awards in similar cases. *See Johnson*, 488 F.2d at 717-19.

the plaintiff. *Grissom*, 549 F.3d at 320-21. Notably, the Supreme Court recently emphasized

that the lodestar amount is presumptively reasonable once calculated in a particular case, and

thus, may be adjusted only "in those *rare circumstances* in which the lodestar does not

adequately take into account a factor that may properly be considered in determining a

reasonable fee." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010) (emphasis added).

Thus, when calculating the lodestar in a case in which not all claims were successful, the district

court must attempt to determine how many hours were reasonably expended litigating the

successful claim, as well as those hours reasonably expended litigating any unsuccessful claims

that were nonetheless related to a successful claim. This determination is appropriately guided

by the *Johnson/Barber* factors. Second, after the lodestar has been calculated, the district court

must consider whether the lodestar reflects all of the *Johnson/Barber* factors, but may adjust the

lodestar based only on the *Johnson/Barber* factors that are not accounted for in the lodestar

figure. Again, any adjustment to the lodestar must be supported by a "objective and reviewable

basis[.]." *Id.* at 558.

    With these principles in mind, analysis appropriately proceeds to the determination of a

reasonable attorney's fee in this case.

1.

    A useful starting point in the lodestar analysis is the reasonableness of the hourly rates

claimed in plaintiff's fee petition. Plaintiff claims an hourly rate of $510 per hour for the time of

Eric Glitzenstein, partner and lead counsel on the case, $360 per hour for the time of Tammy

Belinsky, local counsel for plaintiff in this case, $250 per hour for associate time and $145 per

hour for law clerk time. The prevailing market rate of attorney's fees must be determined based

on the "relevant community where the district court sites (*i.e.*, the Eastern District of Virginia)."

23

*Grissom*, 549 F.3d at 321. Plaintiff argues that the rates it has quoted are lower than the "Laffey Matrix," which sets the market rates in the Washington, D.C. area, for the relevant time frame. Plaintiff, however, overlooks the fact that the Laffey Matrix has little, if any, applicability in determining the prevailing market rates of attorneys' rates in Northern Virginia. *See id.* at 323 ("Plaintiff has produced no evidence that the Laffey Matrix, which pertains to hourly rates of litigation attorneys in Washington, D.C., is a reliable indicator of the hourly rates of litigation attorneys in Reston, Virginia, a suburb of Washington, D.C."). Accordingly, in order to support the quoted rates, plaintiff must produce "satisfactory specific evidence of the prevailing market rates in the relevant community." *Robinson v. Equifax Information Serv's, LLC*, 560 F.3d 235, 244 (4th Cir. 2009) (internal quotation marks and citations omitted). Such evidence consists of "affidavits of other local lawyers who are familiar both with the skills of the fee applicants and more generally with the type of work in the relevant community." *Id.* at 245.

Plaintiff has submitted such an affidavit in this case from Stephen L. Braga, a current Professor of Law at the University of Virginia School of Law who is licensed to practice law in Washington, D.C., and who has opened up his own law office in Northern Virginia. The Braga Affidavit declares that based on his "personal understanding of the legal market in Northern Virginia and specifically in Alexandria" plaintiff's quoted rates are consistent with or lower than rates charged by attorneys in this area with equivalent levels of seniority and experience. Braga Affidavit ¶ 6. However, by itself, such an affidavit does not override this Court's long and extensive experience in this district that many capable and experienced attorneys litigate FOIA cases at rates far less than Mr. Glitzenstein's rate of $510 per hour. This is especially true because FOIA cases—as compared to many other federal question cases such as patent infringement cases, securities fraud cases, ERISA cases, and trademark infringement cases—are

24

not particularly difficult. Moreover, FOIA cases typically involve little to no discovery, and none of the discovery efforts are directed at the plaintiff. Accordingly, courts in this district have generally recognized rates of up to $420 per hour for partners and $250 to $300 per hour for associates as reasonable and appropriate for cases similar in nature, difficulty, and complexity to the instant case.[15] Plaintiff's submission of the Braga Affidavit, which conclusorily asserts that plaintiff's submitted rates are reasonable, does not constitute the "extensive evidence" necessary to justify Mr. Gltizenstein's rate of $510 per hour. *Jones*, 2014 WL 2993443 at *7. Therefore, for the purposes of determining the lodestar amount, Mr. Glitzenstein's hourly rate is reduced to $400 per hour, an amount consistent with a recent fee petition adjudicated in this district.[16] The remaining rates of $360 per hour for Ms. Belinsky, $250 per hour for associate time, and $145 per hour for law clerk time are reasonable and accord with the rates courts in this district have recognized as reasonable for attorneys having similar seniority and experience levels, and thus, these rates are accepted for purposes of calculating the lodestar amount.

**2.**

The next step in the lodestar analysis is to examine plaintiff's fee petition to determine the appropriate number of attorney hours to multiply by the hourly rates. As a preliminary

---

[15] *See Jones v. Southpeak Interactive Corp. of Delaware*, No. 3:12cv443, 2014 WL 2993443 at *7 (E.D. Va. July 2, 2014) (reasonable rate for experienced counsel was $420 per hour based on extensive evidence submitted regarding prevailing market rates in the locality); *Auto. Fin. Corp. v. EEE Auto Sales, Inc.*, No. 1:10cv1407, 2011 WL 3422648 at *8 (E.D. Va. Aug. 3, 2011) (reasonable market rates in Northern Virginia were $335–380 per hour for partners and $250 per hour for associates); *Lake Wright Hosp., LLC v. Holiday Hosp. Franchising, Inc.*, No. 2:07cv530, 2009 WL 4841017 at *7 (E.D. Va. Oct. 23, 2009) (rate of $350 per hour was reasonable and appropriate for law firm partner with 15 years of experience); *Alford v. Martin & Gass, Inc.*, No. 1:08cv595, 2009 WL 2447936 at *4 (E.D. Va. Aug. 3, 2009) ($350 per hour was reasonable rate for experienced counsel).

[16] *See In re Outsidewall Tire Litigation*, 52 F. Supp. 3d 777, 788 (E.D. Va. 2014).

matter, it is important to recognize that plaintiff's counsel represents that it has already exercised

billing discretion by removing a number of time entries from the fee petition. These removed

entries constitute 55.3 hours of attorney time spent on matters related to this litigation. On

balance, plaintiff's submitted time entries are reasonable, although there are a number of time

entries that contain vague task descriptions. Importantly, as fee claimants bear the burden of

establishing the reasonableness of their claimed fee, they must "submit documentation that

reflects reliable contemporaneous recordation of time spent on legal tasks that are described with

reasonable particularity sufficient to permit the court to weigh the hours claimed and exclude

hours that were not reasonably expended." *Guidry v. Clare*, 442 F. Supp. 2d 282, 294 (E.D. Va.

2006) (internal quotation marks and citations omitted). Thus, "inadequate documentation" is a

"proper basis for reducing a fee award because [it] prevent[s] an accurate determination of the

reasonableness of the time expended in a case." *Id.* A number of plaintiff's submitted time

entries in this case contain vague task descriptions that prevent a reliable determination of

whether the hours expended on these tasks were reasonable.[17] In addition, a number of

plaintiff's time entries "lump" several tasks together under a single entry without adequately

documenting the time spent on each task; such a practice "simply does not provide the court with

a sufficient breakdown to meet [plaintiff's] burden to support its fee request in specific

instances." *Project Vote/Voting for America Inc. v. Long*, 887 F. Supp. 2d 704, 716 (E.D. Va.

---

[17] *See, e.g.*, Plaintiff's Application for Attorneys' Fees and Costs, Ex. B, Attachment 1 (hereinafter "Time Records") at 4 (3.58 hours spent to "[d]raft letter to opposing counsel re Vaughn index" and "review borderline documents"); *id.* (1.17 hours spent by Mr. Glitzenstein to "review E.D. Va. case law"); *id.* at 5 (5.75 hours spent on "[a]dditional research on FOIA cases (govt failure to meet burden) and compile list of relevant quotations").

2012).[18] Accordingly, it is appropriate to reduce plaintiff's claimed hours by 5 % to account for these deficiencies.

Applying the relevant reductions to plaintiff's submitted hourly rates and the claimed hours, the adjusted figure of attorney's fees that plaintiff is reasonably entitled to is $103,491.60. And upon consideration of the twelve *Johnson* factors, it is unnecessary to adjust this figure upward or downward. Finally, as noted in Part III.A, *supra*, because none of plaintiff's claims in this litigation are so unrelated so as to justify their treatment as a separate lawsuit, no further reduction in plaintiff's attorney's fee award is warranted.

### C.

Plaintiff also seeks $2,579 in costs, a figure which defendants do not contest. It is well-settled that attorneys are "clearly not entitled to reimbursement of expenses where the request is for an amount which is excessive or otherwise noncompensable." *In re Bausch & Lomb, Inc. Sec. Litig.*, 183 F.R.D. 78, 89 (W.D.N.Y. 1998). Here, however, plaintiff's submitted costs are neither excessive nor unreasonable. And because defendants do not object to any of items that plaintiff is seeking costs for, plaintiff is entitled to recover $2,579 in costs.

### IV.

For the reasons stated herein, plaintiff is entitled to $103,491.60 in attorney's fees and $2,579 in costs, for a total amount of $106,070.60.

An appropriate Order will issue.

Alexandria, VA
June 9, 2015

/s/
T. S. Ellis, III
United States District Judge

---

[f] *See, e.g.,* Time Records at 3 ("Revise motion for production of release of records and Vaughn index and send to clients; email local counsel re filing.").